JOURNAL ENTRY AND OPINION
Defendant-appellant Mary Ballinger ("Ballinger"; date of birth March 1, 1978) appeals from her jury trial conviction for the murder of Charles Peeples[1] in violation of R.C. 2903.02. For the reasons adduced below, we affirm.
A review of the record on appeal indicates that the murder occurred on Sunday morning, February 4, 2001, following a quarrel involving appellant, the victim, and the victim's live-in girlfriend, Jessica Pratt.[2]
The quarrel began that morning when Pratt sent her three-year-old daughter to awaken the sleeping victim and ask him what time it was. The victim was angered by being awakened in this manner causing an argument between the victim and Pratt. According to the appellant, the two started calling each other names and using profanity, at which point the appellant made the decision to intervene.
At the time of appellant's intervention in the argument, appellant was seated on the living room sofa as she held and fed her four-month-old daughter from a baby bottle. The victim was seated to the right of the appellant on the sofa. Pratt was in the kitchen or the dining room, adjacent to the living room. Pratt's uncle, Antonio Alexander, was seated in the living room with his two young sons (ages three and four, respectively) playing a video game on the television.
Appellant's intervention began by the appellant asking the victim why he needed to call Pratt a bitch with children present. The victim responded by generally saying that Pratt was acting like a bitch and appellant was acting like a bitch, too. Tr. 490. Appellant testified that she was not angry at that point. Id. According to Pratt and Alexander, the appellant then slapped the victim. The appellant testified that she was right handed and did raise her hand to the victim, touch his face and cause his head to turn to the side, but did not slap him because there was little force in the hand movement; she did not get upset by the victim's name calling while thinking that the incident was "just kind of stupid." Tr. 490-491. According to the appellant, the victim then slapped the left side of appellant's face one time with his wrist, unintentionally striking the appellant's infant daughter in the face in the process. Tr. 492, 522-523, 526. Appellant stated that this blow to her face caused her head to hurt and a non-serious injury to the inside of her lip, which was not observable to others and did not require medical attention. Tr. 495-496. Alexander, contrary to the appellant, testified that the victim did not strike the infant. According to Pratt and Alexander, the appellant then slapped the victim a second time, placed the infant into a car seat on the end of the sofa opposite the victim, and went into the kitchen and picked up the telephone; she did not place a call. Tr. 523-525. Appellant denied striking the victim a second time. Tr. 529. At that time, Pratt and Alexander were still in the living room with the appellant's infant daughter, so the appellant did not fear for her daughter's safety with regard to the victim.
Appellant returned to the living room a short time later to find Pratt on top of the victim, who was still seated on the sofa. Pratt testified that she was on top of the victim attempting to stop him from getting up, but he was resisting her efforts. Pratt, who tried to calm appellant down, stated that the appellant looked mad, and that appellant would not talk as she returned from the kitchen with the knife. Tr. 339. Appellant's infant daughter was still in her car seat on the opposite end of the sofa as the victim. Tr. 552. Appellant, who had brought a fillet knife with her from the kitchen (but did not remember exactly where she had obtained the knife, see Tr. 496), approached the couple on the sofa as the victim, who saw that appellant was coming at him with a knife, was attempting to stand up from the sofa to avoid being stabbed. Tr. 340-341. As the victim struggled to get off the sofa, Pratt testified that the victim said, "I'm going to kick this bitch's ass." Tr. 341-342. With the victim attempting to stand up and Pratt trying to stop him from doing so, appellant testified that, despite their having had a cordial relationship up to that day, she believed that the victim intended to harm her. Tr. 528-529. According to appellant, the victim had a look on his face and she was scared and did not know what he was going to do. Tr. 497. Appellant then reacted by walking toward the sofa armed with the knife she had obtained from the kitchen. Pratt testified that she kept the knife in her kitchen in a wooden knife block. Tr. 347, 349.
According to Pratt, she was between appellant and the victim, and she and the victim, who were still on the sofa, both grabbed the appellant's left arm, but appellant broke away. Pratt attempted to calm down the appellant, but was not successful. Pratt further testified that the victim, whom she was sitting on and who expressed his fear of being stabbed by appellant as appellant approached the sofa, was attempting to get up after having seen the appellant coming with the knife. With the knife in her right hand, appellant stabbed the victim one time in the upper chest as the victim was seated on the sofa or was in the process of getting up. The victim got up and then collapsed in the kitchen. He expired at the hospital later that morning.
Appellant did not recall Pratt grabbing her arm. Appellant testified that she stabbed the victim because she was trying to protect her infant daughter, herself and her unborn child. Tr. 532-533.
The responding police officer, Sergeant Burner, testified that appellant's demeanor was calm, that he observed no signs that appellant had been fighting or that appellant or her infant daughter had been injured, and that appellant told him at the scene that the victim had run into the knife. Officer Dowd, who also responded to the scene, corroborated Sergeant Burner's testimony concerning the absence of observable injuries to appellant or her daughter. Both policemen stated that no medical attention was requested of appellant or her daughter. The murder weapon was found in the kitchen sink.
The coroner testified that there were no defensive wounds on the victim and the fatal wound perforated the body between the first and second ribs, traveled through the upper right lung cavity and then pierced both sides of the aorta, from the right side toward the left side, from the front of the body toward the back side, to a depth of five inches, with a slight downward angle to the wound.[3] Tr. 231, 235. Examination of the victim's body fluids showed no signs of drugs or alcohol present. Tr. 237, 248. There were no visible signs of injury to appellant's infant daughter on the day of the murder, and appellant reported no injuries to the infant when questioned by the police. However, that daughter was taken to a doctor by appellant's mother on February 7, 2001, at which time the doctor observed puffiness on her left eye and mild bruising; appellant attributes this puffiness and bruise to having been struck by the victim on February 4, 2001. Tr. 544, 560. When asked on re-direct examination what she would have done had the victim gotten up from the sofa, appellant responded that she would have walked away. Tr. 554.
Appellant claimed that Pratt had told her of being physically abused by the victim, but appellant admitted that she never saw the victim strike Pratt, but she did state that she had observed bruising on Pratt which was caused by Pratt and the victim fighting. Appellant also testified about having observed the victim on two occasions carrying Pratt's daughter, screaming, up the steps by her collar. Appellant next stated that she observed the victim shooting a gun into the air in celebration of New Year's Eve; she did not know if the gun was still in the apartment on the date of the murder, but the police did find some bullets in the apartment. Appellant also testified that she has had a seizure disorder since she was eight years old, and experiences approximately two to four seizures per year with the last seizure, which required hospitalization, occurring in the month prior to the murder. Tr. 461-464. Appellant stated that she takes the medication Tegretol twice daily, at 9:00 a.m. and 9:00 p.m., in 200mg doses, and had not yet taken her morning dose at the time of the murder. Tr. 465-467. Missing, or being late with, a dose of medication has caused her to experience headaches, blurred vision, light-headedness, and slurred speech in the past. Tr. 465. She also testified that she had not taken her 9:00 p.m. medication on the evening prior to the murder. Tr. 467. Despite this claimed lapse in medication, appellant stated that she felt "okay" at the time of the murder. Tr. 467-468.
The jury returned a verdict of guilty and appellant was subsequently sentenced to a term of 15 years to life imprisonment.
Appellant presents two assignments of error for review.
The first assignment of error provides:
I. APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.
In this assignment appellant argues that her trial counsel's representation was ineffective in allegedly failing,
 "to support one of the primary defenses asserted on behalf of Ms. Ballinger with sufficient evidence, thereby prejudicing Ms. Ballinger in the eyes of the jury and depriving her of an opportunity to a fair trial."
Appellant's brief at 5.
The defense to which appellant refers is that appellant allegedly experienced a seizure at the time of the murder, which would negate a purposeful killing of the victim. Appellant maintains that counsel should have done more to establish that she was, in fact, under the throes of a seizure when she obtained the murder weapon and stabbed the victim. Appellant suggests that counsel could have called as witnesses a medical expert on the seizure disorder or appellant's own treating physician. Had counsel expended this additional effort, it is argued that a reasonable probability exists that the outcome of the trial would have been different.
The standard of review for a claim of ineffective assistance of trial counsel was recently set forth by this court in Statev. Grady (Mar. 14, 2002), Cuyahoga App. Nos. 79662 and 79663, unreported, 2002 Ohio App. LEXIS 1093 at 15-16:
 To prevail on a claim of ineffective assistance of counsel, a defendant must show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. State v. Goodwin
(1999), 84 Ohio St.3d 331, 334, 703 N.E.2d 1251, quoting Strickland v. Washington (1984), 466 U.S. 668, 687, 80 L.Ed.2d 674, 104 S.Ct. 2052. A Sixth Amendment violation does not occur unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. State v. Bradley (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373. To establish prejudice, a defendant must show that there exists a reasonable probability that, were it not for counsel's errors, the result of trial would have been different. Id. at paragraph three of the syllabus.
It is well-established that counsel's decisions concerning which witnesses to call at trial fall within the realm of trial strategy and tactics, State v. Coleman (1989), 45 Ohio St.3d 298, 307-308,544 N.E.2d 622, certiorari denied (1990), 493 U.S. 1051, 110 S.Ct. 855,107 L.Ed.2d 849, and generally will not constitute ineffective assistance of counsel. State v. Nicholas (1993), 66 Ohio St.3d 431, 436,613 N.E.2d 225. In addition, any questions regarding the ineffectiveness of counsel must be viewed in light of the evidence against the defendant. Bradley,42 Ohio St.3d at 142-143.
The appellant testified at some length concerning her history of seizures, her use of medication, and the effects of not taking the medication in a timely manner. Immediately after admitting that she had a lapse in her medication regimen, defense counsel asked appellant on direct examination whether she was having any problems at the time of the stabbing because of this lapse. Appellant responded by testifying that she felt "okay." Tr. 467-468. On cross-examination, when asked by the prosecution whether she was having a grand mal or non-grand mal seizure at the time of the stabbing, appellant responded that she did not know, that she had no idea. Tr. 510. Neither of the other witnesses, Alexander or Pratt, had any testimony concerning appellant showing signs of a seizure on the day of the murder. Appellant did not complain of a seizure to the responding officers or medical personnel.
Given the appellant's own testimony that she felt okay at the time of the stabbing with regard to her seizure condition, and the complete lack of any testimony or observable evidence to support appellant's trial strategy that she incurred a seizure event at the time of the stabbing, we cannot conclude that defense counsel's representation was deficient in not offering further medical expert testimony to buttress this defense claim. A medical expert's testimony would not have altered either the appellant's stated belief that she was okay at the time of the murder with regard to her seizures, or the fact that no other person observed signs of a seizure in appellant that morning. Accordingly, In light of the evidence presented at trial, we find that appellant has not established that there is a reasonable probability that the outcome of her trial would have been different if her trial counsel had called a medical expert on her behalf.
The first assignment of error is overruled.
The second assignment of error provides:
 II. TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE OFFENSE OF INFERIOR DEGREE OF VOLUNTARY MANSLAUGHTER.
The inferior degree offense of voluntary manslaughter pursuant to R.C. 2903.03(A), a first degree felony, is defined in pertinent part as follows:
 (A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.
In State v. Deem (1988), 40 Ohio St.3d 205,533 N.E.2d 294, paragraph five of the syllabus, the Ohio Supreme Court determined that,
 Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time.
In State v. Shane (1992), 63 Ohio St.3d 630, 634,590 N.E.2d 272, the Ohio Supreme Court clarified Deem and determined that,
 An inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components. n1 In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. * * * If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction.[4]
See, also, State v. Wong (1994), 95 Ohio App.3d 39,51-52, 641 N.E.2d 1137, reconsideration denied, 97 Ohio App.3d 244,646 N.E.2d 538, dismissed, appeal not allowed, 70 Ohio St.3d 1455,639 N.E.2d 793.
A defendant charged with murder is only entitled to a jury instruction on voluntary manslaughter when the evidence presented at trial could support both an acquittal on the charged crime of murder and a conviction on the inferior-degree offense of voluntary manslaughter.Shane, supra, 63 Ohio St.3d at 632.
In the present case, the evidence indicates that the victim called appellant a bitch and slapped her. Appellant herself testified that this negative remark by the victim did not upset her. See Tr. 491, lines 24-25, 535. The "mere words" of calling appellant a bitch cannot, by itself, form the basis for sufficient provocation for the application of deadly force. See Shane, supra, at 635. Similarly, we cannot conclude that the solitary slap by the victim, which may have accidentally come into contact with the appellant's infant daughter, constituted serious provocation sufficient to incite the use of deadly force by appellant. Despite appellant's protestation that she feared for her, and her infant daughter's, safety, appellant left her infant daughter in an infant seat on the sofa with the victim when appellant exited the room. Appellant did not worry about her daughter being alone in the room with the victim because two other people, who were responsible, were in the room. See Tr. 533-534. Further, the claimed injury to her daughter cannot form the basis for serious provocation because that injury, if in fact it was caused by the slap of the victim, was insignificant being unobservable on the day of the murder and nominal, at best, when viewed several days after the murder. Given that appellant left the room for a period of time after having been slapped, a reasonable person would have cooled off in the interim between the slap and the stabbing. The victim only became threatening to appellant a second time when he saw appellant coming at him with a knife; it was after seeing an armed appellant coming at him that the victim tried to get off the sofa and said he wanted to harm the appellant, but was prevented from doing so by the actions of Pratt who was on top of him as appellant came toward the sofa. Objectively lacking reasonable provocation, the trial court did not err in refusing to instruct on the inferior offense of voluntary manslaughter.
Furthermore, no reasonable jury could have found appellant not guilty of the purposeful killing of the victim where the appellant retrieved a knife from the kitchen, came back to the seated victim who was then being restrained by Pratt, did not respond to Pratt's attempts to calm her down and prevent her from harming the victim, and stabbed the victim from above with such force that she embedded practically the entire length of the knife blade into the victim's chest. Accordingly, the trial court did not err in refusing to give the requested instruction on voluntary manslaughter.
The second assignment or error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TERRENCE O'DONNELL, J., CONCURS; ANNE L. KILBANE, J., CONCURS INJUDGMENT ONLY.
[1] The victim's autopsy protocol, see State Exhibit 3, indicated that the victim was 25 years old, weighed 149 pounds, and was 70 inches tall. Appellant testified that her pregnancy due date was October 6, 2001, that she presently weighed 227 pounds (which included approximately 37 pounds in weight gain due to the pregnancy), and that she was between 62 and 63 inches tall. Given the appellant's due date, and the recognized fact that the gestation period for a human is nine months, it is reasonable to infer that appellant was approximately one month pregnant at the time of the murder.
[2] Pratt is the appellant's cousin.
[3] State Exhibit 10, a photograph of the murder weapon against a ruler, indicates that the blade of the knife was approximately 5 3/4 inches in length.
[4] Footnote 1 in Shane states the following in pertinent part:
 "There are four obstacles for the defendant to overcome before he can have his intentional killing reduced from murder to voluntary manslaughter: (1) There must have been a reasonable provocation. (2) The defendant must have been in fact provoked. (3) A reasonable man so provoked would not have cooled off in the interval between the provocation and the delivery of the fatal blow. And (4), the defendant must not in fact have cooled off during that interval." 2 LaFave Scott, Substantive Criminal Law (1986) 255, Section 7.10.
 Factors (1) and (3) are objective; factors 2) and (4) are subjective. * * *